UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------X
                                        :
ANDY KING,                              :
                                        :
                  Plaintiff,            :
                                        :
     -against-                          :
                                        :        20-CV-8283 (PAC)
THE CITY OF NEW YORK,                   :
THE NEW YORK CITY COUNCIL,              :
COREY JOHNSON, STEVEN MATTEO,           :        **OPINION & ORDER**
MARGARET   S.   CHIN,    KAREN          :
KOSLOWITZ,  VANESSA  L.  GIBSON,        :
STEPHEN   T.   LEVIN,   JIMMY   VAN     :
BRAMER, and JOHN and/or JANE DOE,       :
                                        :
                  Defendants.           :
                                        :
-----------------------------------------------------------X
```

Plaintiff Andy King, a former New York City Council member, was expelled from his elected office in October 2020 for the alleged commission of numerous acts of ethical misconduct. King alleges these charges were a pretextual mask for his former colleagues' true motivation: his failure to "conform his voting and views to the powerful pro-gay rights faction of the New York City Council . . . ." (Amend. Compl. ¶ 1, ECF No. 44.)

Shortly after his expulsion, King filed this 42 U.S.C. § 1983 lawsuit pursuing both federal and state claims against the City of New York, the New York City Council, and individual Council members and staffers (collectively, "Defendants").

Defendants now move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, their motion is **GRANTED**.

## BACKGROUND

### I.   King's Tenure in the City Council

The following facts are drawn from the Amended Complaint ("Complaint") and assumed true for purposes of resolving this motion.  Plaintiff Andy King is a Black man and a "devout" Christian who believes "sex between members of the same sex is a detestable sin" and "an abomination."[1]  (Amend. Compl. ¶ 19.)  From 2012 to 2020, he represented District 12 in the Bronx on the New York City Council.  (*Id.* at ¶¶ 20, 143.)  According to the Complaint, the "vast majority" of District 12 constituents share King's belief that "sex between members of the same sex is a sin."  (*Id.* at ¶ 24.)

Guided by his religious views, and those of his constituents, King routinely opposed "pro-LGBT issues," including legislation supporting same-sex marriage, mandating gender-neutral restrooms, and allowing New Yorkers to change their gender markers on official documents.  (*Id.* at ¶¶ 34–35.)  He also expressed his anti-LGBT views symbolically.  In June 2016, for example, following the Pulse nightclub shooting in Florida, Councilmember Jimmy Van Bramer organized "a pro-gay public ceremony in the Chamber of the City Council."  (*Id.* at ¶ 40.)  In preparation for this ceremony, Van Bramer "affixed gay pride flags" on each of the Council members' desks along with prepared remarks for them to read in a show of solidarity for the LGBT community.  (*Id.* at ¶¶ 41–43.)  King, however, refused to read those remarks and, "in open defiance of . . . Van Bramer's attempts to force King to publically compromise King's religious beliefs," removed himself from the Council Chambers.  (*Id.* at ¶ 44.)

---

[1] The Complaint alleges one instance of racist abuse against King (Amend. Compl. ¶ 37), but does not identify racial discrimination as the basis for any of his causes of action; rather, King alleges he was discriminated against "on account of [his] religion and creed and on account of his sexual orientation as a Christian and as a heterosexual man." (*Id.* at ¶ 198.)

As a result of his "unwillingness to support [their] pro-LGBT agenda," King found himself at odds with the Council's "powerful faction" of "strong supporters of gay rights." (*Id.* at ¶¶ 26, 46.) Included in this subset was the Council's LGBT Caucus. (*Id.* at ¶ 27.) According to the Complaint, the LGBT Caucus controlled "significant aspects of the operations and policy-making decisions of the City Council" and was comprised of prominent members and allies, including Councilmember Van Bramer and Council Speaker Corey Johnson. (*Id.* at ¶¶ 26–33.)

## II.   King's Disciplinary Issues

In 2017, King began to face serious disciplinary issues within the City Council. First, a Council staffer named Chloe Rivera reported an incident of sexual harassment against King. (*Id.* at ¶ 47.) Rivera alleged King "shook Rivera's hand, invited her to King's wedding anniversary ball and suggested that she attend the event, smile and wear a pretty gown." (*Id.* at ¶ 48.) This accusation was leaked to the media, allegedly by the City Council's General Counsel office. (*Id.* at ¶ 51.) Although King denied the "bogus" allegation, he agreed to resolve the issue by taking a mandatory training class on workplace harassment. (*Id.* at ¶¶ 52, 55.)

Things only deteriorated from here. In early 2019, one of King's own former staffers claimed she had been "forced to quit due to 'harassment' by King's wife." (*Id.* at ¶ 58.) This prompted the City Council's General Counsel to launch a formal investigation into King and his staff. (*Id.* at ¶¶ 59–60.) Following a six-month investigation, in August 2019, the Council's Ethics Committee lodged official charges against King, and shortly thereafter, superseded those charges with additional counts. (*Id.* at ¶¶ 63, 79–84.) The superseding charges accused King of: (1) retaliating against his staff for cooperating with the General Counsel's investigation; (2) permitting a member of his staff to create a hostile work environment in his office; (3) allowing his wife to use the resources of his elected office for personal gain; (4) failing to properly reimburse staffers

for gasoline expenses, and (5) improperly "object[ing] to the uploading of a Gay Pride Parade photograph on King's personal Twitter account by one of King's staff," explaining that his "objection[] to the gay lifestyle (as portrayed at the Gay Pride Parade) was similar to his objections to child pornography." (*Id.* at ¶ 84.)

In September 2019, the Ethics Committee held a hearing on the superseding charges. (*Id.* at ¶¶ 103–104.) King did not attend the hearing due to a scheduling conflict and was represented before the Ethics Committee by legal counsel. (*Id.* at ¶ 98.) At some point during the disciplinary proceedings, the Complaint alleges Councilmember Van Bramer stated that he and his colleagues were voting to sanction King "because of King's prior 'detestable' statements about homosexuality."[2] (*Id.* at ¶ 111.)

Upon the conclusion of the hearing, the Ethics Committee sustained the superseding charges and recommended the following disciplinary sanctions against King: (1) a 30-day suspension without pay; (2) a $15,000 fine; (3) the loss of all committee memberships; and (4) the appointment of an independent monitor to oversee King's office. (*Id.* at ¶ 105.) On October 28, 2019, the full City Council voted to ratify these recommendations and the sanctions were imposed.[3] (*Id.* at ¶ 107.)

## III.   King's Expulsion from the City Council

In January 2020, shortly after King had completed his 30-day suspension, the Ethics Committee levied fresh charges against him. (*Id.* at ¶ 125.) These new charges were based on

---

[2] The Complaint also alleges that, earlier in 2019, Councilmember Ruben Diaz Sr. was removed from his committee chairmanship because of public statements he made regarding pro-LGBT Council members' outsized influence on City Council politics. (Amend. Compl. ¶¶ 66–72.)

[3] At the October 28, 2019 legislative session, several Council members moved to expel King from his elected office. (Amend Compl. ¶ 113.) That last-minute maneuver, however, proved unsuccessful. (*Id.* at ¶ 114.)

4

various allegations of misconduct that occurred between 2017 and 2019. (*Id.* at ¶ 125.) Specifically, the Ethics Committee charged King with: (1) harassing a staffer for her "menstrual bleeding"; (2) soliciting a kickback involving City Council funds; and (3) failing to fully cooperate with the terms of his 2019 disciplinary sanctions. (*Id.* at ¶¶ 131–133.) The Ethics Committee held a hearing on these charges in the summer of 2020, and ultimately recommended King's expulsion from the Council. (*Id.* at ¶¶ 129, 141.) On October 5, 2020, the City Council nearly unanimously[4] ratified this recommendation and removed King from its ranks. (*Id.* at ¶ 143.)

## IV.   Procedural History

King filed the instant action in October 2020.[5] (*See* ECF Nos. 1, 9.) The following month, Defendants moved to dismiss the case. (*See* ECF No. 13.) Upon King's failure to respond to that motion, the Court ordered him to show cause why a default judgment should not issue. (*See* ECF

---

[4] All members voted in favor of expulsion other than Councilmember Diaz and King himself. (Amend. Compl. ¶ 143.) The vote thus comfortably eclipsed the two-thirds majority required to expel a member the Council under the New York City Charter. (*Id.* at ¶¶ 142–143.) Although the Complaint does not specify, the Court takes judicial notice of City Council minutes reporting a final margin of 48-2 in favor of expulsion. (*See* Exhibit E at 2–3, ECF No. 65-6 (publicly available at https://legistar.council.nyc.gov/Calendar.aspx.))

[5] The parties acknowledge that King initiated, and lost, prior Article 78 proceedings in 2019. *See King v. New York City Council,* Index No. 160439/19, 2019 N.Y. Misc. LEXIS 6481 (N.Y. Sup. Ct., N.Y. Cnty., Dec. 11, 2019) ("This court finds this controversy to be non-justiciable, the relief sought moot and that petitioners due process rights were not violated."). King's appeal of that decision is pending. *See King,* Index No. 160439/19, Dkt. No. 28 (N.Y. Sup. Ct., N.Y. Cnty., Mar. 4, 2021). King also filed, and voluntarily withdrew, a separate action in New York state court in June 2020. *See King v. New York City Council,* Index No. 154185/2020 (N.Y. Sup Ct., N.Y. Cnty. June 22, 2020). In the 2019 Article 78 proceedings, Defendants argue, King made claims "analogous" to some—but not all—of the claims he now pursues in this Court. (Defs.' Br. at 25 n.12, 26, ECF No. 66.) Defendants contend these claims should now be barred by the doctrines of *res judicata* and collateral estoppel. The Court disagrees: because King's earlier actions were filed prior to many of the events underlying this lawsuit, including King's October 2020 expulsion from the Council, Defendants have not met their burden to show the claims in the Complaint implicate either the *res judicata* or collateral estoppel doctrines. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 126 F.3d 365, 369 (2d Cir. 1997); *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir. 1991).

No. 16.) In January 2021, after King again failed to respond, the Court entered a default judgment and dismissed this case. (*See* ECF Nos. 18, 19.)

King did not appear again until Defendants moved for attorney's fees. (*See* ECF Nos. 20, 24, 25.) In February 2021, the Court convened a conference with the parties and granted King permission to file a Rule 60(b) motion to reopen this case. (*See* Min. Entry dated February 17, 2021.) King subsequently did so and, after full briefing, the Court concluded there was good cause to reopen this case. (*See* ECF No. 32.) On May 5, with the benefit of new lead counsel, King filed an Amended Complaint, which Defendants[6] now move to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* ECF No. 64.)

## DISCUSSION

King's claims arise under both federal and New York law.[7] (*See* Amend. Compl. ¶¶ 153–218.) On the federal front, he claims the disciplinary measures imposed by the City Council violated his rights under the First Amendment, the Fourteenth Amendment's Due Process Clause, and the Fourteenth Amendment's Equal Protection Clause. He also alleges malicious abuse of process and conspiracy under 42 U.S.C. §§ 1983 and 1985(3), as well as *Monell* liability against the City. As to New York law, King pleads violations of the New York State Constitution, New York City Human Rights Laws ("NYCHRL"), CPLR Article 78, and New York common law.

The upshot of the narrative underlying these claims is that the disciplinary charges inviting King's expulsion were pretextual, and that Defendants' actual motivation was their personal

---

[6] The Complaint names the following defendants: the City, the City Council, several individual Council members—some of whom served on the Ethics Committee—and John and Jane Doe members, staffers, and/or agents of the City Council. (Amend. Compl. ¶¶ 5–16.) The individual defendants are sued in their individual and official capacities. (*Id.* at ¶ 15.)

[7] The Court has federal question jurisdiction over King's federal claims and may exercise supplemental jurisdictional over his state law claims. *See* 28 U.S.C. §§ 1331, 1367.

animus toward King's anti-LGBT views.  As redress for these alleged wrongs, King seeks monetary damages, legal fees and costs, and reinstatement to the City Council.

## I.      Legal Standard

In analyzing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts all allegations in the complaint as true and draws all inferences in favor of the plaintiff.  *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2d Cir. 2001).  The "undertaking here is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  *Velez v. Levy*, 401 F.3d 75, 80 (2d Cir. 2005) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).  On a motion to dismiss, the Court may consider documents that are attached as exhibits, incorporated by reference, or integral to the complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  It may also take judicial notice of public records, such as complaints filed in state court and city council minutes.  *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 695 (S.D.N.Y. 2011).

## II.     Federal Claims

To survive a motion to dismiss a claim brought pursuant to 42 U.S.C. § 1983, "a plaintiff must allege (1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state law."  *Velez*, 401 F.3d at 84 (cleaned up); *see Monroe v. Pape*, 365 U.S. 167, 171 (1961).  Here, the parties do not dispute that Defendants acted "under color of state law" in imposing disciplinary sanctions on King.  *Velez*, 401 F.3d at 84.  The determinative issue on this motion, therefore, is whether Defendants deprived King of a federal right.  *See id.*

King pleads several violations of federal law, including: his First Amendment rights to (1) Free Speech and (2) Free Exercise; his Fourteenth Amendment rights to (3) Procedural Due Process, (4) Equal Protection, and (5) Substantive Due Process; (6) malicious abuse of process and conspiracy under 42 U.S.C. §§ 1983 and 1985(3); and (7) *Monell* liability against the City. For the following reasons, each of these claims must be dismissed.

## A.    Free Speech

King alleges his expulsion from the City Council was in retaliation for his anti-LGBT political views and therefore in violation of his First Amendment right to Free Speech. (Amend. Compl. ¶¶ 153–158.) To plead such a claim, "a plaintiff must show that (1) his actions were protected by the First Amendment; and (2) the defendant's alleged conduct was in response to that protected activity." *Velez*, 401 F.3d at 97.[8]

### 1.    *Extent of First Amendment Protection*

As an initial matter, the Court must survey the bounds of King's protection under the First Amendment in this exceptional, political context. Here, two foundational principles are at odds: (1) the First Amendment interest in affording legislators the "widest latitude to express their views on issues of policy," *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966); and (2) the public interest disfavoring judicial entanglement in "politically motivated conduct committed within the confines of legislatures and best left within the legislative sphere." *Camacho v. Brandon*, 317 F.3d 153, 161 (2d Cir. 2003); *see McGuinn v. Smith*, No. 11-CV-4761 (CS), 2015 WL 12731755, at *6 (S.D.N.Y. Aug. 28, 2015) ("[T]he political arena is a unique setting where ordinary notions of

---

[8] In *Velez*, the Second Circuit held that this test, rather than those applicable to employment Free Speech claims, should govern retaliation claims arising in the legislative context because such claims are "far better understood as a more basic sort of retaliation claim: adverse action by state officials—whether in or out of the employment context—against a plaintiff based on her exercise of constitutionally protected speech rights." 401 F.3d at 95–97.

First Amendment protection sometimes yield to the political nature of democratic governance.").[9]

Courts have worked to tease out the precise contours of these dueling interests. In *Elrod* and *Branti*, the Supreme Court held that a government employer may take adverse action against an employee for speech otherwise protected under the First Amendment if the employee occupies a "policymaking position[]."[10] *Elrod v. Burns*, 427 U.S. 347, 367 (1976); *see Branti v. Finkel*, 445 U.S. 507, 517 (1980). As "quintessential policymaker[s]," city council legislators may be subject to this *Elrod/Branti* carveout from First Amendment protection in some contexts. *See Velez*, 401 F.3d at 96. In such contexts, the First Amendment does not protect these political actors from "retaliation by their foes for their position on matters of public concern." *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*, No. 13-CV-4340 (CS), 2015 WL 1379702, at *10 (S.D.N.Y. Mar. 25, 2015) (internal quotations omitted), *aff'd*, 637 F. App'x 16 (2d Cir. 2016); *see also Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543–44 (9th Cir. 2010) ("[W]e expect political officials to cast votes in internal elections in a manner that is, technically speaking, retaliatory . . . ; the First Amendment does not succor casualties of the regular functioning of the political process.").

In two mid-2000s opinions, the Second Circuit in quick succession both endorsed and qualified this approach. First, in *Camacho v. Brandon*, it found that, as a policymaker, a city council member could not invoke First Amendment protection where his fellow legislators had

---

[9] The Supreme Court has held that claims such as King's are justiciable. *See Powell v. McCormack*, 395 U.S. 486, 548 (1969) (declining to construe claim brought by a legislator excluded from Congress as governed by the political question doctrine).

[10] Even where First Amendment protection applies in full force, a government employee may still be fired for speaking on matters of public concern if their employer "fears disruption as a result of the employee's speech," among other requirements. *Velez*, 401 F.3d at 95 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). Although Defendants assert a disruption defense (*see* Defs.' Br. at 19–23), because the Court dismisses King's Free Speech claim on other grounds, it need not address these arguments.

"retaliated against him for his political associations as well as his votes."[11]  317 F.3d at 161–62.

Just two years later, however, it ruled in *Velez v. Levy* that while the First Amendment may not

protect an elected official from certain forms of retaliation—including actions that "undoubtedly

*set into motion* [plaintiff's] ouster" from their elected office—it does protect against state officials

altogether "stripping elected representatives of their office on the political views of such

representatives." 401 F.3d at 98–101 (emphasis added) (citing *Bond*, 385 U.S. at 137 ("[T]he

disqualification of Bond from membership in the Georgia House because of his statements violated

Bond's right of free expression under the First Amendment.")). Key to the *Camacho* decision, the

*Velez* Court emphasized, was that even after his aide had been terminated, the elected official in

*Camacho* had "remained free to express his political views in the council chamber, to cast votes,

and to serve his constituents in his capacity as a member of the council." *Velez*, 401 F.3d at 97. It

noted with approval the following passage from Judge Walker's *Camacho* concurrence:

> [Imagine if] a majority of the Council *barred [the council member] from Council*
> *meetings, or otherwise prevented him from voting*, in retaliation for his political
> associations. . . . I have no doubt that, were that case before us, we would find that
> [the council member] retained the right of free association under the First
> Amendment and that such retaliatory measures violated that right.

*Id.* at 98 (emphasis added) (quoting *Camacho*, 317 F.3d at 166 (Walker, C.J., concurring)).

Thus, although seemingly in some tension, *Velez* and *Camacho* together establish a

workable rule: elected officials enjoy no First Amendment protection from retaliation for political

speech unless that retaliation strips them of their office, or their fundamental ability to function in

that office. In other words, courts weighing the extent of First Amendment protection against

---

[11] Although the actual claimant in *Camacho* was an aide to a non-party legislator, not the
legislator himself, the court grounded its analysis in the validity of the legislator's own
hypothetical retaliation claim. *See* 317 F.3d at 160–62; *Velez*, 401 F.3d at 96 ("[*Camacho*]
began from the premise that the plaintiff's asserted right was derived from—and therefore
contingent upon—the free speech right of the council member for whom he worked.").

retaliation should distinguish between (allegedly) retaliatory legislative *speech* and retaliatory legislative *sanction*. This approach also squares with the Second Circuit's prior holding in *X-Men Sec., Inc. v. Pataki* emphasizing the First Amendment interest in allowing purportedly retaliating legislators their *own* "breathing space" in pursuing investigations, holding hearings and meetings, and—crucially—recommending and advocating for consequences based on those findings, even where those findings are alleged to be "false and derogatory."[12] *See* 196 F.3d 56, 63, 68 (2d Cir. 1999) ("We are aware of no constitutional right on the part of the plaintiffs to require legislators to refrain from such speech or advocacy.").

District courts in this Circuit have consistently distilled and applied this rule. *See, e.g.*, *McGuinn*, 2015 WL 12731755, at *6 (dismissing a First Amendment claim where defendant school board members passed an allegedly retaliatory resolution and launched a "smear campaign" against plaintiff that "caused [him] to cease speaking" at meetings, but ultimately did not remove him from his elected position, even though defendants had the authority to do so); *Mousaw v. Bd. of Educ. of Colton Pierrrepont Cent. Sch. Dist.*, No. 07-CV-1006, 2011 WL 1667909, at *6 (N.D.N.Y. May 3, 2011) (dismissing plaintiff school board member's First Amendment claim where defendant board members with no expulsion power "engag[ed] in a deliberate campaign to humiliate and besmirch Plaintiff's character with the goal of removing her from the Board"); *Paladino v. Seals-Nevergold*, No. 17-CV-538, 2020 WL 5544342, at *3 (W.D.N.Y. Sept. 15, 2020) (dismissing plaintiff school board member's First Amendment claim where defendant board

---

[12] The defendant legislators in *X-Men*, allegedly in retaliation for the plaintiff contractor's association with the Nation of Islam, were alleged to have falsely accused the plaintiff of being "part of a 'hate group' that practiced racism, gender discrimination, anti-semitism, and other religious discrimination, of being fraudulently mismanaged, and of forcing its religious views on the Ocean Towers tenants by distributing religious literature while on duty." 196 F.3d at 71 (internal citations omitted) ("Even if false, as alleged by the complaint, the legislators' statements are entitled to First Amendment protection.").

members' allegedly retaliatory petition "set into motion" plaintiff's ouster, but "did not actually

remove [plaintiff] from his position"); *Nelson v. Bd. of Educ. of Jamestown City Sch. Dist.*, 411 F.

Supp. 2d 341, 346 (W.D.N.Y. 2006) (dismissing plaintiff school board member's First

Amendment claim where allegedly retaliatory resolution prevented her from "*carrying out* the

wishes of those who elected her," but not from "representing" those interests by speaking or voting

at board meetings) (emphasis in original).[13]

Applying this rule here, much of the complained-of conduct is impervious to King's

retaliation claim. The Complaint chronicles a slew of accusations and investigations which in turn

triggered charges, hearings, rulings, and recommendations from the Ethics Committee. Although

these actions were allegedly undertaken with the eventual "goal of removing [him] from the

board," *Mousaw*, 2011 WL 1667909, at *6 (dismissing an analogous claim), they did not disturb

King's right to "express his political views in the council chamber, to cast votes, and to serve his

constituents in his capacity as a member of the council." *Velez*, 401 F.3d at 97. Nor indeed did

the officials taking these actions have any legal authority, on their own, to do so—at most, they

---

[13] Other circuits have employed similar approaches. *See, e.g., Blair*, 608 F.3d at 544 ("[D]espite his removal as Board vice president, [plaintiff] retained the full range of rights and prerogatives that came with having been publicly elected."); *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 34 (1st Cir. 1996) (holding that the Governor of Puerto Rico enjoyed "no First Amendment protection" against Puerto Rico Senate investigations and hearings allegedly motivated by the Governor's "beliefs and political association"); *Peeper v. Callaway Cty. Ambulance Dist.*, 122 F.3d 619, 623 n.4 (8th Cir. 1997) (although "[l]imitations on an elected official's participation in the proceedings of a public body" *may* run afoul of the First Amendment, a resolution with no effect on plaintiff's "ability to vote for Board members, to speak before the Board during public comment periods, or to otherwise express her opinions about the District's operation" did not); *Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1248 (10th Cir. 2000) (public school board of trustees censure did not infringe board member's First Amendment rights because it "did not prevent her from performing her official duties or restrict her opportunities to speak, such as her right to vote as a Board member, her ability to speak before the Board, or her ability to speak to the public"); *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404–06 (3d Cir. 2006) (ejecting city council member from a council meeting altogether may violate the First Amendment).

had the power to "set into motion" a cascade of events that eventually led to the full Council sanctioning King. *Id.* at 97 ("[T]hough the actions of the board member defendants undoubtedly set into motion Velez's ouster, those actions cannot . . . support a First Amendment retaliation claim."). King's allegations based on these acts of legislative investigation and advocacy thus fail to implicate the First Amendment. *See Mousaw*, 2011 WL 1667909, at *6 (N.D.N.Y. May 3, 2011) (dismissing a First Amendment claim centered around an allegedly retaliatory investigation of a sexual harassment complaint levied against plaintiff elected official).

The only allegedly retaliatory acts in the Complaint that may be actionable under the Second Circuit's guidance, as set forth in *X-Men*, *Camacho*, and *Velez*, are the full Council votes adopting the Ethics Committee's recommended sanctions—including a 30-day suspension and the loss of committee memberships and, later, to expel King from the Council entirely.[14]  Only these acts, then, can sustain a First Amendment retaliation claim.

### 2. *Causal Connection*

But even with respect to this subset of conduct alleged in the Complaint that *is* cognizable under the First Amendment—the full Council's votes to ratify the Ethics Committee's formal

---

[14] The Court does not foreclose the notion that, under some circumstances, it may be more appropriate to view all legislative actions leading to expulsion as parts of the same whole.  Not so here: per the Complaint, the many accusations, investigations, hearings, and votes came from dozens of individual actors from across the Council and its staff.  And as discussed *infra* p. 15 any allegations of a vast, coordinated conspiracy between these scores of individuals—or widespread fear of reprisal by the "powerful pro-gay rights faction"—are entirely conclusory. (*See* Amend. Compl. ¶¶ 1, 143, 163.)  Faced with analogous circumstances, the *Velez* court distinguished (and dismissed) retaliation claims against investigating elected school board officials, who did not have removal authority, from a well-pleaded First Amendment claim against a school chancellor who did have—and, *based on the results of the board's investigation*, exercised—removal authority against the plaintiff board member. *See* 401 F.3d at 99.  As in *Velez*, this Court declines King's invitation to treat all of the complained-of conduct as a monolith, and instead distinguishes between the allegedly retaliatory legislative maneuvering that "set into motion" his sanctions, and the sanctions themselves. *See id.*

recommendations—King's Free Speech claim falls short for a different reason. The Complaint fails to plausibly allege the second element of a First Amendment retaliation claim: that this conduct was in retaliation for King's speech. *See Velez*, 401 F.3d at 97.

As his Complaint exhaustively documents, King was charged with several serious ethics violations, including (1) retaliating against his staff for cooperating with investigations into his wrongdoing; (2) permitting a hostile work environment; (3) allowing his wife to use the resources of his office for personal gain; (4) failing to properly reimburse his staff; and (5) objecting to the uploading of a photograph to King's personal Twitter account, citing "objections to the gay lifestyle (as portrayed at the Gay Pride Parade)" that were "similar to his objections to child pornography." (Amend. Compl. ¶ 84.)  After these charges had been sustained, and sanctions imposed, King was charged with a second set of ethics violations, including (1) harassing a staffer for her "menstrual bleeding"; (2) soliciting a kickback involving City Council funds; and (3) failing to fully cooperate with the terms of his 2019 disciplinary sanctions. (Amend. Compl. ¶¶ 131–133.)   Following formal hearings sustaining these charges, the Council exercised its legislative authority under the New York City Charter to sanction and expel King. (*Id.* at ¶¶ 103–104, 129, 142–143.)  Based on the nature and circumstances of these events, the Court cannot plausibly infer that King's political views are what caused the Ethics Committee to recommend, and dozens of Council members to independently vote for, King's suspension, removal from

committees, and, eventually, expulsion.[15]  *See Velez*, 401 F.3d at 99.

King's claims to the contrary are devoid of the "specific and detailed factual allegations" necessary to sustain a retaliation claim.  *See id.* at 97.  Even when viewed in its most favorable light, the Complaint presents no specific facts plausibly linking any of Defendant's actions cognizable under the First Amendment to King's anti-LGBT speech.  At best, it alleges that some Council members strongly disapproved of these views, and, *separately,* that in the wake of numerous reported ethics violations and investigations, many voted to curtail, and then remove, his seat on the City Council.

Conspicuously absent, however, are any particularized allegations knitting those two threads together.  To the extent the Complaint purports to plead specific facts about any individuals, it focuses on Speaker Johnson and Councilmember Van Bramer, neither of whom sat on the Ethics Committee, and each of whom accounted for just one of the overwhelming majority of votes sanctioning and expelling King.  King's sweeping, unsupported proclamations that "[a]ll other Members voted to expel King because they were members of the pro-LGBT faction of the City Council or they were scared that a vote against the motion to expel would lead to retaliation against them" are far too conclusory to counsel seriously against dismissal.  *See Munoz-Feliciano*, 2015 WL 1379702, at *6 ("[C]onclusory allegations of causation will simply not support a First Amendment retaliation claim.").  So too are King's dangling, unelaborated assertions that the

---

[15] For that matter, even if *all* of the complained-of conduct was cognizable under the First Amendment, the Court still could not plausibly infer causation.  Accepting as true King's claim that one (of many) allegedly "bogus" complaints was "urged" by Councilmember Van Bramer "in retaliation for King's prior actions and conduct regarding pro-LGBT agendas" (Amend. Compl. ¶ 50), this solitary drop in a bucket filled with other, unrelated actions taken by—per the Complaint—dozens of legislators, staffers, investigators, and accusers does not plausibly demonstrate that King's woes were *"substantially* caused" by a retaliatory motive.  *See Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (emphasis added).

individual defendants acted "in concert" (Amend. Compl. ¶ 163)  with one another or "at the direction" (*id.* at ¶ 63) of Speaker Johnson.  *See X-Men*, 196 F.3d at 71 ("[T]he complaint contains several charges of 'participation' in a 'conspiracy' that are conclusory, and are for that reason insufficient to state a claim.").

Therefore, King has failed to state a viable Free Speech claim.[16]

**B.     Free Exercise**

King pursues an additional theory under the First Amendment.  He claims his Free Exercise rights were violated when Defendants allegedly expelled him from the City Council due to their animosity toward his Christian faith.  (Amend. Compl. ¶¶ 153–158.)  This claim also fails.

Under the Free Exercise Clause, state action that expresses "hostility" toward religion is subject to strict scrutiny.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 162 (2d Cir. 2020).  Because "government hostility to religion can be masked, as well as overt, a court must proceed to a second step of inquiry to identify even those subtle departures from neutrality, or covert suppression of particular religious beliefs that will not be tolerated unless" strict scrutiny review is satisfied.  *New*

---

[16] The Court notes that dismissal as to the individual defendants may be warranted, at least to some extent, for other reasons.  *See Lewis v. Cowen*, 165 F.3d 154, 166–67 (2d Cir. 1999) (holding that government defendants enjoyed qualified immunity from plaintiff's First Amendment claim: "The relevant inquiry is not whether the defendants should have known that there was a federal right, in the abstract, to 'freedom of speech,' but whether the defendants should have known that the specific actions complained of violated the plaintiff's freedom of speech."); *see also State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 82–83 (2d Cir. 2007) ("It is uncontroversial that legislative immunity may bar claims for money damages brought against state and local officials in their personal capacities."); *Whitener v. McWatters*, 112 F.3d 740, 741 (4th Cir. 1997) ("[A] legislative body's discipline of one of its members is a core legislative act" and therefore subject to "absolute legislative immunity."); *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 507 (1975) (extending legislative immunity to legislative aides, counsel, and other subcommittee staff, as well as individual legislators).  Because the Court dismisses King's Free Speech claim—as well as each of his other claims—for other reasons, it need not address the extent to which qualified or legislative immunity may impact those claims.

*Hope*, 966 F.3d at 163 (cleaned up).

To start, King's Free Exercise claim differs from his Free Speech claim in that it is the *practice* of his religion (exercise)—as opposed to expressive *manifestations* of his faith (speech)—that is alleged to have provoked his expulsion from the Council. This distinction, although thin, is critical. In support of his Free Exercise claim, King relies on the same factual allegations as those that buttress his Free Speech claim—namely, Defendants' hostility toward his political views on LGBT issues. But these allegations do not raise the plausible inference that Defendants acted out of hostility against King *on the basis of his Christian faith. Cf. Masterpiece Cakeshop*, 138 S. Ct. at 1729 (finding hostility where a government official called religion "one of the most despicable pieces of rhetoric that people can use [to justify discrimination]"); *New Hope*, 966 F.3d at 168 (hostility was plausibly pled where government allegedly made negative statements about religious adoption agencies). Nor does the First Amendment provide any relief for an elected official against generally applicable workplace discrimination and harassment laws. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

Accordingly, King's Free Exercise claim must be dismissed.

### C.    Procedural Due Process

Next, King pleads two Procedural Due Process claims under the Fourteenth Amendment. *First*, he alleges Defendants improperly deprived him of his property interest in his elected office without due process of law. (Amend. Compl. ¶¶ 167–176.) *Second*, he pleads a "stigma-plus" claim on the theory that Defendants casted false aspersions on his reputation in the course of the City Council's disciplinary proceedings. (*Id.*) The Court addresses each claim in turn.

#### 1.    *Property Interest Claim*

In order to plead a due process claim on a property interest theory, a plaintiff must first

establish her entitlement to a property interest. *Velez*, 401 F.3d at 85 (cleaned up). Although property interests are constitutionally protected, they are typically not "constitutionally *established*; rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* (internal quotations omitted).

King's property interest claim unravels on this point. The Second Circuit has held that a public official "lacks a constitutionally cognizable property interest in her elected office." *Velez*, 401 F.3d at 86; *see Taylor and Marshall v. Beckham*, 178 U.S. 548 (1900). Therefore, because King does not enjoy a property interest in his Council seat, his due process claim on these grounds is not cognizable. *See Velez*, 401 F.3d at 86.

2.    *Stigma-Plus Claim*

King's stigma-plus claim under the Due Process Clause alleges that he suffered harm to his reputation and the loss of his public office, thereby depriving him of "liberty without sufficient process." *Velez*, 401 F.3d at 87; *see Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) ("[A] stigma-plus claim . . . involves an injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus) without adequate process.").

To plead a stigma-plus claim, a plaintiff must demonstrate, "(1) the utterance of a statement about her that is injurious to her reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement." *Velez*, 401 F.3d at 87 (cleaned up); *see Monserrate v. New York State Senate*, 599 F.3d 148, 158 (2d Cir. 2010). Even if these requirements are met, however, the "availability of adequate process defeats a stigma-plus claim." *Segal*, 459 F.3d at 213.

The Court concludes that King received adequate process and so, his stigma-plus claim must be dismissed. *First*, as required under *DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003), King received pre-deprivation hearings before being subjected to the disciplinary sanctions that were issued in 2019 and 2020. *Id.* at 302 (requiring pre-deprivation hearing "where the government actor in question is a high-ranking official"). Accordingly, he was afforded adequate opportunity to clear his name against the stigma resulting from the Ethics Committee's disciplinary charges. *Segal*, 459 F.3d at 213.

*Second*, the City Council hearings—for all their alleged shortcomings—provided King with adequate notice of, and sufficient opportunity to defend himself against, his charges. *See Monserrate*, 599 F.3d at 158. As the Second Circuit explained in *Montserrate*, "Even if the process [State Senator] Monserrate received did not include these [additional due process] features, he nevertheless received a sufficient opportunity to clear his name—and that is all the Constitution requires." *See id.* at 159–60. Because this standard was satisfied in King's case, the Court dismisses his stigma-plus claim.

### D.    Equal Protection

Turning next to the Equal Protection Clause, King pleads two types of selective enforcement claims:  one alleging discrimination on a "class-of-one" theory and another alleging class-wide discrimination. (Amend. Compl. ¶¶ 177–191.) The Court again addresses each in turn.

#### 1.    Class-of-One Claim

A class-of-one discrimination claim is premised on the theory that an employer treated "one employee differently from others similarly situated, regardless of whether the different treatment is based on the employee's membership in a particular class." *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 597 (2008). Because this case arises in the context of

public employment, King's class-of-one discrimination claim is foreclosed by the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture*. 553 U.S. at 597. In *Engquist*, the Supreme Court held that a public employee who had been terminated was barred from bringing a class-of-one Equal Protection claim against her public employer because allowing such claims "would impermissibly constitutionalize the employee grievance." *Id.* (cleaned up). *Engquist* applies with equal force here, and so King's class-of-one claim must be dismissed. *See id.*

      2.    *Class-Wide Claim*

King alternatively pleads a selective enforcement claim on a class-wide basis, alleging that he was unfairly sanctioned because he belonged to "a discrete and insular minority group of devout Christians living in the City of New York" that advocated an anti-LGBT political agenda. (Amend. Compl. ¶ 187.) To prevail on this selective enforcement claim, King must plausibly allege that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." [17] *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir. 1996).

Under this standard, King's selective enforcement claim falters because he does not plead any "similarly situated" individuals who were treated more favorably on the basis of their religious affiliations. *See Arteta v. Cty. of Orange*, 141 F. App'x 3, 8 (2d Cir. 2005). The Complaint, instead, refers to three other Council members who, in the past, received softer disciplinary

---

[17] *Engquist* does not directly foreclose King's class-wide discrimination claim. 553 U.S. at 597, 605 ("[O]ur cases make clear that the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently."). And the "Second Circuit has not yet decided whether selective enforcement claims are still viable in the public employment context after *Engquist*." *Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011).

sanctions than King for purportedly similar ethical violations.   (Amend. Compl. ¶¶179–180.)

These comparisons, however, do not demonstrate that King was treated less favorably *because of*

*his religious affiliation*—which is the protected class at issue in King's class-wide selective

enforcement claim. *See Arteta*, 141 F. App'x at 8.

In other words, even if it is true that these councilmembers were treated more favorably

than King for similarly situated misconduct, the Court cannot plausibly infer that this disparity

resulted from their differing religious beliefs.   *See id.*   For that reason, King's class-wide

discrimination claim must be dismissed.

### E.      Substantive Due Process

The Complaint also asserts a Substantive Due Process claim under the Fourteenth

Amendment.  (Amend. Compl. ¶¶ 167–176.)  "For a substantive due process claim to survive a

Rule 12(b)(6) dismissal motion, it must allege governmental conduct that 'is so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez*, 401 F.3d 75

(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  However, "where a

specific constitutional provision prohibits government action, plaintiffs seeking redress for that

prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due

process." *Id.*  In that scenario, the Substantive Due Process claim is subsumed into the "more

particularized allegations." *Id.*

Here, because the Complaint pleads "more particularized allegations" under other

provisions of the Federal Constitution, the Substantive Due Process claim dissolves into those

other claims. *See id.*  Therefore, it must be dismissed.

### F.      Malicious Abuse of Process and Conspiracy Claims

Next, the Complaint pleads claims of malicious abuse of process and conspiracy under 42

U.S.C. §§ 1983 and 1985(3).  (Amend. Compl. ¶¶ 159–166.)

At the outset, King's § 1983 malicious abuse of process claim is untenable under *Cook v. Sheldon*, 41 F.3d 73 (2d Cir. 1994).  In *Cook*, the Second Circuit explained that a malicious abuse of process claim, in the context of a *civil* case, could not result in § 1983 liability.  *Id.* at 79–80. The Court is faced here with a civil case; therefore, King's malicious abuse of process claim fails under § 1983.  *See id.*

With respect to King's conspiracy claim, dismissal is also warranted for two reasons.  *First*, to "state a valid conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must, among other things, plausibly allege the existence of a conspiracy to deprive him of his constitutional rights." *Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011).  Here, the Complaint does no such thing.  Rather, it cursorily alleges that the individual defendants "acted in concert" (Amend. Compl. ¶ 163) with one another to deprive King of his Constitutional rights, but does not furnish any particularized allegations in support of that proposition.  *See id.*  Consequently, King's conspiracy claim is insufficiently pled.

*Second*, King's conspiracy claim must also be dismissed pursuant to the intra-corporate conspiracy doctrine.  This doctrine "provides that a corporation or public entity generally cannot conspire with its employees or agents as all are considered a single entity."  *Everson v. New York City Transit Auth.*, 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002).  The Second Circuit has held that the intra-corporate conspiracy doctrine applies to § 1985 claims, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), and district courts within this Circuit have routinely applied the doctrine to § 1983 claims, *see Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (collecting cases).  Here, there is no dispute that the purported conspirators comprise one public entity: the City Council.  (Amend. Compl. ¶¶ 5–16.)  Applying the intra-corporate

conspiracy doctrine, then, the Court concludes Defendants could not have conspired with one another to deprive King of his federal rights. *See Everson*, 216 F. Supp. 2d at 76. Accordingly, his conspiracy claim must also be dismissed on this ground.

### G.   *Monell* Claim

To round out his federal claims, King pleads a *Monell* claim against the City. "To hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (cleaned up). Because King has failed to plausibly allege "a denial of a constitutional right," *Id.* at 297, his *Monell* claim cannot be sustained.

## IV.   State Law Claims

In addition to the federal claims brought pursuant to § 1983, the Complaint also asserts several causes of action under New York State law. These include: (1) claims under the New York State Constitution; (2) a malicious abuse of process claim under New York common law; (3) a claim under the NYCHRL, and (4) an Article 78 claim. For the following reasons, the Court dismisses each of King's state law claims.

### A.   State Constitutional and Malicious Abuse of Process Claims

King's claims under the New York State Constitution and his malicious abuse of process claim each fail New York's notice of claim requirement. Under Section 50-e of the New York General Municipal Law, a plaintiff cannot sue "a municipality or any of its officers, agents, or employees unless" he first serves a notice of claim on the municipality within 90 days after the claim arose. *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 708 (S.D.N.Y. 2011). This notice of claim rule has been "construed strictly by New York state courts"

and failure to comply with it "ordinarily requires a dismissal" of certain state law causes of action. *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (cleaned up).

It is the plaintiff's burden to show compliance with the notice of claim rule. *Wheeler v. City of Middletown*, No. 16-CV-8857 (VB), 2021 WL 2206490, at *9 (S.D.N.Y. June 1, 2021). To do so, a "plaintiff must plead in the complaint that: (1) the Notice of Claim was served; (2) at least thirty days has elapsed since the Notice of Claim was filed and before the complaint was filed; and (3) in that time the defendant has neglected to or refused to adjust or to satisfy the claim." *Id.* (quoting *Horvath v. Daniel*, 423 F. Supp. 2d 421, 421 (S.D.N.Y. 2006)).

Here, King concedes he did not satisfy the notice of claim rule but contends that compliance should be excused under the public interest exception articulated in *Mills v. Monroe County*, 59 N.Y.2d 307 (1983). In *Mills*, the New York Court of Appeals explained that notice of claim requirements do not apply to "actions that are brought to protect an important right, which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class or group." *Id.* at 311.

King's lawsuit does not fit within this narrow exception. Each of King's causes of action complains of his private injuries at the hands of the City Council, and seeking personal redress for those injuries: monetary damages, attorney's costs, and reinstatement to the City Council. The Court therefore finds that the public interest exemption is inapplicable and that the notice of claim rule applies. And on that ground, King's claims under the New York State Constitution and his

malicious abuse of process claim must be dismissed.[18]

**B.    NYCHRL Claim**

King also pleads a claim under the NYCHRL, alleging discrimination based on his classification as a "Christian and as a heterosexual man." (Amend. Compl. ¶¶ 196–202.) At the outset, King's NYCHRL claim is not *per se* barred under the notice of claim rule. *See Mosdos Chofetz*, 815 F. Supp. 2d at 709 (explaining that the notice of claim rule does not apply to civil rights claims).   Nonetheless, King's NYCHRL claim must be dismissed because he fails to properly plead it under the NYCHRL's burden-shifting framework.

Claims brought under the NYCHRL are subject to the same burden-shifting analysis applied to discrimination claims brought under Title VII. *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).  "Under this test, a plaintiff establishes a *prima facie* case of discrimination by showing that: (1) he was a member of a protected class; (2) he was competent to perform the job in question, or was performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination." *Id.*

Here, the Complaint fails to plead allegations sufficient to satisfy this standard.  It fails to allege, for example, whether King was "competent to perform the job in question" or whether the circumstances of his expulsion "give rise to an inference of discrimination." *Spiegel*, 604 F.3d at 80.  Nor does the Complaint state whether Christian heterosexual males constitute a protected

---

[18] King alternatively argues that "if the Court were to dismiss the state claims" on the notice of claim requirement, then "it should do so without prejudice" so that he can file a late notice of claim.  (King Br. at 23, ECF No. 67.)  As other courts in this district have recognized, however, this Court does not have the "authority to permit [a] plaintiff to file a late notice of claim." *See, e.g., Wheeler*, 2021 WL 2206490, at *9 (citing *Brown v. Metropolitan Transp. Auth.*, 717 F. Supp. 257, 260 (S.D.N.Y. 1989)).

class. *Id.* Thus, because King has not stated a *prima facie* claim of discrimination under the NYCHRL's burden-shifting framework, his claim is dismissed.

### C.     Article 78 Claim

Having dismissed each of King's other claims, including all federal claims, the Court declines to exercise supplemental jurisdiction over his Article 78 claim.   District courts may decline to exercise supplemental jurisdiction over state-law claims where, *inter alia*, it "has dismissed all claims over which it has original jurisdiction."   28 U.S.C. § 1367(c)(3).   Further, "[r]ecognizing state courts' exclusive jurisdiction over Article 78, courts within this circuit have consistently declined to exercise supplemental jurisdiction over Article 78 claims." *De Jesus v. City of New York*, No. 10-CV9400 (GBD), 2012 WL 569176, at *4 (S.D.N.Y. Feb. 21, 2012).

The Court finds this reasoning persuasive, and thus dismisses King's Article 78 claim without prejudice.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.   The Clerk of Court is respectfully directed to terminate this case.

Dated: New York, New York             SO ORDERED
       January 13, 2022

                                       HONORABLE PAUL A. CROTTY
                                       United States District Judge